GEORGE W. REMICK, Admr.,

*v.*

PETER EMIG *et al.*

1. PARTNERSHIP—*dissolution of by death.* On the death of a partner, the partnership is, *ipso facto*, dissolved, and the survivors have no lawful right to expend the money of the firm, however necessary the expenditure may be to the conduct of the business.

2. ADMINISTRATOR — *his silence not to prejudice the estate.* And, where the administrator of a deceased partner sees the surviving partners expending the funds of the firm, and does not forbid it, this cannot, as in the case of a person acting in his own right, estop him from resisting a claim growing out of it.

3. PARTNERSHIP *affairs — how settled after a dissolution by death.* Upon the dissolution of a partnership by the death of one of the firm, the property is common, to be divided according to the shares of the partners, after the payment of the debts. This property is, *first,* the stock in trade as originally contributed, with all the additions made to it; *second,* real estate owned by the company; and *third,* in certain cases, the " good will" of the concern.

4. In taking an account between the partners themselves, the state of the stock is to be taken as at the death of the deceased partner, and the proceeds thereof until it is got in, and each partner is to be allowed whatever he has advanced to the partnership, and to be charged with what he has failed to bring in, or has drawn out more than his just proportion. If there be no agreement to the contrary, the partners are to be allowed equal shares of the profits and stock.

5. And, where no account of stock was taken at the death of one partner, and by an arrangement with his administrator, the surviving partners carried on the business of the concern for nearly a year, when they rendered an account to the administrator, the proper mode of stating the accounts between the parties is: state the value of the stock as it was at the death of the deceased partner, adding the proceeds thereof up to the time of rendering an account; each partner should be charged with what he failed to bring in to the partnership, or has drawn out more than his just proportion; each partner is to be allowed whatever he has advanced to the partnership, and the balance remaining equally divided between them.

WRIT OF ERROR to the Circuit Court of Clinton county; the Hon. SILAS L. BRYAN, Judge, presiding.

The facts in the case are fully stated in the opinion of the court.

Messrs. BUXTON & White and H. K. S. O'MELVENY, for the plaintiff in error.

Messrs. WILLIAM H. UNDERWOOD and W. A. J. SPARKS, for the defendants in error.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was a bill in chancery, exhibited in the Clinton Circuit Court, by George W. Remick, administrator on the estate of

Josiah P. Johnson, deceased, against Peter Emig and Adam Emig, for a discovery and an account of a partnership in a flouring mill in which the defendants and the intestate were partners.

It appears from the record, that, on the 21st day of May, 1860, Johnson, being the owner of a steam flouring mill in Trenton, in Clinton county, formed with Peter and Adam Emig a partnership therein, as equal partners, having sold to them an interest of two-thirds in the same, and to share equally in the profits and losses of the business. That the stock consisted of the lots on which the mill was situate with its appurtenances in block four (4), and in certain other adjacent lots in the same town, in block five (5), with a cooper shop and cooper stuff and barrels then on hand, and one two-horse wagon, and one pair of mules, all of which was valued at $18,000. The Emigs, by this arrangement, became owners of two-thirds of this property, Johnson retaining one-third. It appears, Johnson died on the 15th of February, 1862.

Remick, the complainant, took out letters of administration, on the 23d of February, 1862, and from that time until the 1st day of January, 1863, the survivors, Peter and Adam Emig, carried on the business of the concern, and as they allege, by agreement with complainant, on which day they exhibited to Remick an account of the effects then on hand belonging to the intestate, by which, they showed that they held in their hands $4,293.80, belonging to the deceased partner, and paid the same to Remick. The claim of Remick now is, that the interest of his intestate in the partnership effects and property amounted to $4,000 over and above the sum accounted for and paid over by the Emigs, and for which they refused to account. The prayer of the bill was, that the defendants, the survivors, make discovery, and state a true and particular account of all the partnership matters in their hands or control, with the particular nature, qualities, quantity and true value thereof at the time of Johnson's death, and before and since; and of the rents, issues and profits thereof, and how the same have been applied or disposed of; and also, for an

account of the debts due the partnership, and what part has been collected and how applied ; and also, an account of the money, choses in action and effects belonging to the partnership, in their hands, possession or control at the time of the death of the intestate, and how the same have been applied and disposed of, and the uses to which they have put the real property ; and also, that they present a schedule of every deed, book account, note, paper or writing relating to these matters, and deposit it with the clerk of the Circuit Court, and to make full answer and discovery of all and singular these matters, and that an account may be taken of the partnership affairs from its commencement to its dissolution, and of their actings and doings since that time, and that the survivors may be decreed to pay complainant what, upon such account, there may be found due him.

The defendants filed a joint answer, sworn to by Peter Emig, which, on exceptions being taken and allowed, was twice amended, a replication filed and the cause came to issue, and was referred to the master in chancery to take testimony. No objection was made to this course, and Peter Emig, one of the defendants, was the principal witness. The controversy grows chiefly out of the account he rendered of the wheat on hand on the 1st day of January, 1863. He had stated to complainant at that time, there were ten thousand bushels, worth seventy-five cents a bushel, and forty-eight hundred bushels of inferior wheat worth sixty cents per bushel. He also stated that about two thousand dollars of the assets of the firm had been applied to building a granary after the death of the intestate. He also said, when he paid complainants the four thousand two hundred and ninety-three dollars and eighty cents, on the 10th of January, 1863, that the effects of the firm at that time, including bills and accounts receivable, flour and grain, barrels and cooper shop account, amounted to fifteen thousand two hundred and ninety-four dollars, the liabilities, which included the accounts of the intestate, stated at two thousand eight hundred and sixty dollars, that of himself to twenty-two hundred and seventy-three dol-

lars and thirty-five cents, and that of Adam Emig to three thousand eight hundred and five dollars and ten cents, and for a substitute in the mill, in place of the intestate, two hundred and thirty dollars, made a total of six thousand nine hundred and eighty-eight dollars and ninety-five cents.

The complainant sought to surcharge this account of wheat, and introduced several witnesses who had measured the piles in the bins, in a satisfactory manner as it is insisted by complainant, and they estimated the wheat at more than nineteen thousand one hundred bushels, and worth on an average about seventy cents per bushel.

The master in chancery reported on the evidence, this payment of four thousand two hundred and ninety-three dollars and eighty cents, made by the defendants to the complainant, in January, 1863, and found of wheat on hand at that time, nineteen thousand one hundred and fifty-nine bushels, making a difference against defendants of four thousand three hundred and fifty-nine bushels, which he estimated at an average of seventy-five cents per bushel. The master also declined to allow defendants any part of the two thousand dollars expended in the granary as a charge against the estate of complainant's intestate. The master also charged against the defendants the sum of five thousand dollars, being the amount due from Adam Emig on account of the purchase of his interest in the concern, and which they had deducted in their statement of account from the assets of the firm as money paid to Samuel Cranwell, to whom the intestate was indebted, and to pay whom the defendants were fully authorized. The master also charged against the complainant one-third of sixty-three dollars ninety-four cents, for the taxes paid by defendants on the mill property for 1862.

The cause coming on to be heard at the August Term, 1865, on the bill, answer, replication and proof, and master's report, the court entered a decree for complainant against the defendants, for nine hundred dollars and forty-three cents, and costs of suit, "subject to modification hereafter, if thought incorrect,"

and, at the ensuing March Term, 1866. the court ordered the cause to be removed from the docket.

To reverse this decree, complainant brings the record here by writ of error, and assigns for error, that the decree should have been for him for four thousand eight hundred and thirty-three dollars and sixty-six cents, and more; that the decree should have been rendered according to the master's report.

The principal controversy grows out of the estimate of wheat on hand in the mill and granary, on the 1st day of January, 1863, the day on which defendants accounted to complainant, and the cost of the granary, complainant insisting, that no part of that should be charged against the estate he represents.

We do not perceive the grounds on which the court passed a decree for nine hundred dollars against the defendants, nor the *data* on which it is based; nor are we entirely satisfied with the report of the master made in the cause.

On the death of Johnson, the partnership was, *ipso facto*, dissolved, and the survivors had no lawful right to expend the money of the firm in the erection of a granary, however necessary it may have been to the conduct of the business. The bare fact that complainant saw them making this granary, and did not forbid it, cannot, as in the case of a person acting in his own right, estop him from resisting a claim growing out of it. The granary was not erected on the mill property but in a public street, and can be in no sense regarded as appurtenant to the mill and premises, though it was connected to the mill itself by spouts and a conveyor. It was erected on public ground, and over it, the public might exercise control. But it is said, this granary was built before the complainant sold the interest of the intestate in the mill property, and that it enhanced the value of it at the sale, and produced more money to the estate by reason thereof. The record furnishes no proof of this, and the master did right in rejecting any part of the cost as a charge against the estate.

As to the wheat on hand, the mode adopted by Douglas and Alvord, to ascertain the quantity, was proved to be a reliable mode, yet it was adopted some time after the account rendered

to complainant in January, 1863, and there is evidence tending to show that defendants were purchasing grain from that time, to the time of the measurement. The books of defendants, if correctly kept, ought to show the exact amount and its value, on the day the account was rendered. Failing in this, there is no injustice in resorting to any reliable mode by which to ascertain the amount, but, as the defendants have made their statement of the amount of wheat on hand and its value, on the 1st of January, 1863, under oath, and offered their books for examination, and no error is pointed out in them, we do not think their sworn statements are so disproved as to falsify them. The weight of evidence must, we think, be accorded to the defendants, and their statement of the amount on hand as sworn to by them, together with their books, ought to prevail unless clearly disproved.

In 2d Bell's Com. 645, it is said: Until the final settlement of the partnership affairs, and the payment of the joint debts, and distribution of the joint property, the partnership is not really determined. On the dissolution, the property is common, to be divided according to the shares of the partners, after the payment of the debts. This property is, — first, the stock in trade as originally contributed, with all the additions made to it; second, real estate owned by the company, and, third, in certain cases, "the good will" of the concern seems to be regarded as forming a part of the common stock.

In taking an account between the partners themselves, the state of the stock is to be taken as at the death of one partner and the proceeds thereof until it is got in ; and each partner is to be allowed whatever he has advanced to the partnership, and to be charged with what he has failed to bring in, or has drawn out more than his just proportion. The partners, if there be no agreement to the contrary, are to be allowed equal shares of the profits and stock.

On these principles, the defendant should have taken an account of stock at the death of Johnson, which, from the testimony of Peter Emig, they failed to do, doubtless from ignorance of their duty and not from design.

By an arrangement with complainant, which seems to be undisputed, the survivors carried on the business of the concern, from the 15th of February, 1862, to the 1st of January, 1863, when they presented their books of account, showing all their ·business transactions to complainant, who did not make any objection to them, and received from the defendants the sum of $4,293.80, as the total amount then due the estate, provided all the debts due the firm should be collected. It appears, that, in November, 1862, by virtue of an order of the County Court, complainant sold at public auction, to pay debts, his intestate's one-third interest in the mill property, to one Fox, who thereupon became a tenant in common with these defendants in that property, and entitled to one-third of the rents and profits thereof. The granary was erected by defendants, in the summer and autumn before the sale, and on a public street of the town of Trenton, no part of it being on the lots of the firm, but connected with the mill by spouts and conveyors.

In stating the account between these parties, as called for by the bill, the defendants, as surviving partners, should fully disclose the state of the stock as it was at the death of Johnson, and the proceeds thereof up to the time of rendering the account to complainant, January 1, 1863.

Each partner should be charged with what he has failed to bring in to the partnership, or may have drawn out more than his just proportion. Each one of the partners is to be allowed whatever he has advanced to the partnership, and the balance remaining be divided into three equal parts, one equal part to be accounted for to complainant, and the remaining two equal parts to be retained by the defendants.

With these principles in view, there can be no difficulty in showing the true balance for which the defendants should account. We are asked to enter a decree in this court. This we decline doing, as more testimony may be heard on another hearing, and we do nothing more than to state the principles on which the account should be made out by the defendants as surviving partners.

The decree is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Decree reversed.*